**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

John R. Beardmore,
Kathrine A. Beardmore,
and Terry Hedstrom,

Plaintiffs,

v.

American Summit Financial
Holdings, LLC; and
Duckson, Carlson, Bassinger & Mitchell, LLC,

Defendants/
Third-Party Plaintiffs,

v.

Superior Financial Holding Corporation;
Tantalon Group Inc.; Thomas P. Kell; Todd R.
Haugan; and Richard Lefcowitz,

Third-Party Defendants.

Civil No. 01-948 (DWF/SRN)

**MEMORANDUM**
**OPINION AND ORDER**

---

Timothy R. Thornton, Esq. and Jack Y. Perry, Esq., Briggs & Morgan, 2400 IDS Center, 80 South 8th Street, Minneapolis, Minnesota 55402; Scott G. Knudson, Esq., Briggs & Morgan, W2200 1st National Bank Building, 332 Minnesota Street, St. Paul, MN 55101, on behalf of Plaintiffs.

Scott R. Carlson, Esq., Ralph V. Mitchell, Jr., Esq., and Christine Middleton, Esq., Duckson, Carlson, Bassinger & Mitchell, 333 7th Street South, Suite 2100, Minneapolis, Minnesota 55402, on behalf of Defendants/Third-Party Plaintiffs.

John H. Strothman, Esq., David L. Sasseville, Esq., and Robert C. Friday, Esq., Lindquist & Vennum, 4200 IDS Center, 80 South 8th Street, Minneapolis, Minnesota 55402 and Todd R. Haugan, Esq., Haugan Law Office, 641 Lake Street East, Suite 204, Wayzata, Minnesota 55391, on behalf of Third-Party Defendants.

---

APR 0 4 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on October 12, 2001, pursuant to the Defendant American Summit's Motion for Summary Judgment.[1] Based on a thorough review of the record in this case, the submissions and arguments at hearing by the parties, and being otherwise duly advised in the premises, the Court denies in part and grants in part Defendant's Motion for Summary Judgment.

## Background

For purposes of completeness and as set forth in its previous memorandum opinion and order, the Court will restate the facts giving rise to the current litigation.

The current action revolves around the issuance of a duplicate stock certificate. However, the facts preceding its issuance are far from straightforward. On September 8, 1999, John and Kathrine Beardmore[2] purchased 3,350,000 shares of Superior Financial Holding Corporation ("Superior") common stock by executing a $2,500,000 promissory note to Founders Equity

---

[1] Also at the October 12, 2001, hearing, the Court heard Plaintiff John Beardmore's Motion to Dismiss or Stay the Counterclaims of Defendant Duckson, Carlson, Bassinger & Mitchell, LLC and Third-Party Defendant Briggs & Morgan P.A.'s Motion to Dismiss the Third-Party Complaint. The Court ruled on both motions to dismiss by its Memorandum Opinion and Order, dated December 10, 2001, and, by that same order, the Court reserved judgment on the motion for summary judgment for a 30-day period during which the parties met to discuss settlement. The Court's current order now addresses the remaining motion for summary judgment. As the Court will discuss further below, Plaintiffs' purported cross-motion for summary judgment is not properly before the Court, and thus the instant Memorandum Opinion and Order will address only Defendant American Summit's motion for summary judgment.

[2] While both John and Kathrine Beardmore are named plaintiffs to the current action, Mrs. Beardmore apparently became involved only because she is a signatory to the note used to purchase the Superior Financial stock. Mr. Beardmore was primarily involved in the numerous transactions relating to the current action, and thus the Court will hereinafter refer to Mr. Beardmore as "Beardmore."

Group, Inc. ("Founders"). The Beardmore purchase represented 74.4% of Superior's outstanding shares. In order to secure the note, Beardmore pledged to Founders a security interest in 2,500,000 shares of Superior and 1,500,000 shares of Innovative Financial Systems, Inc. ("IFS"). In addition, Beardmore pledged to Founders at least one mortgage and an option to buy 250,000 Superior shares at $1 per share ("the Founders Option").[3] The promissory note came due on September 8, 2000.

On September 13, 1999, Superior acquired complete ownership of the Lake Bank, N.A., a bank located in Two Harbors, Minnesota.

The Beardmore/Founders Note matured on September 8, 2000. Because the note had not been paid in full, it went into default. On October 25, 2000, Beardmore sold 1,000,000 Superior shares to the Lake Bank's 401K Employee Stock Ownership Plan ("ESOP") and Trust for $1.00 per share and concomitantly paid down the Founders note by $1,000,000. Subsequent to the sale, Superior issued to Beardmore Stock Certificate 33 ("Certificate 33") which indicated his ownership of 1,500,000 of his 2,000,000 remaining shares.[4] Beardmore delivered to Founders Certificate 33, pursuant to their pledge agreement.

When Founders notified Beardmore that it intended to sell the collateral and apply the proceeds toward the amount due on the note, Beardmore requested that the sale be postponed.

---

[3] In Defendant American Summit's Memorandum in Support of its Motion for Summary Judgment, it refers to a security interest in one residential mortgage for a property in Alexandria, Minnesota. (Defendant's Memorandum, p. 4.) However, in their Complaint, Plaintiffs represent that the note was secured in part by two mortgages. (Complaint, ¶ 16.) It is unclear whether the discrepancy represents merely an oversight or a dispute of fact; nevertheless, even if the parties dispute whether the note was secured by one or two mortgages, the Court does not deem such a dispute to be material.

[4] Apparently, the remaining 500,000 shares owned by Beardmore were evidenced by Certificate 20.

By way of a letter dated February 22, 2001, Founders agreed to postpone the sale if Beardmore agreed to: (1) acknowledge the notice and amount of default on the note; (2) acknowledge the terms of the proposed sales as "commercially reasonable"; and (3) provide the names of potential purchasers for purposes of notification. The terms purported to constitute a "reasonable sale" were: (1) the sale would occur at Founders' offices on a weekday; (2) during normal business hours; (3) open to the public; and (4) notice would be published in the "Dallas Morning News and one other paper that you request if you so request." Beardmore agreed to Founders' terms by countersigning the February 22, 2001, letter.

On February 15, 2001, prior to signing the aforementioned letter, Beardmore granted to Duckson, Carlson, Bassinger & Mitchell, LLC ("Duckson Carlson") an option to purchase his 2,000,000 Superior shares at $1.50 per share ("the Duckson Carlson Option"). On March 1, 2001, Beardmore transferred all of his IFS shares to Terry Hedstrom ("Hedstrom"), and the IFS shares were specifically encumbered by the Beardmore/Founders note and pledge. Plaintiffs maintain that Founders was aware of the IFS transfer, given the presence of a Founders principal on the board of IFS.

On April 2, 2001, American Summit Financial Holdings, LLC ("American Summit") paid to Founders $1,800,000 for the Beardmore/Founders note and its collateral and an additional $50,000 for the Founders Option. In order to perfect the security interest, Founders transferred to American Summit Certificate 33 and the IFS stock certificate.

On April 11, 2001, American Summit informed Beardmore of its intent to hold a public sale of the IFS stock on April 27, 2001, at 10:00 A.M. American Summit also placed notice of the sale in the *Dallas Morning News*, and *Finance and Commerce* in Minnesota. In addition, American Summit issued notice to those entities with a security interest in the IFS stock. Present

at the sale were Beardmore's attorney, Paul Thissen; the president of IFS, Mark Smith; Terry Hedstrom; the president of American Summit, Michael McVay; a representative of Beardmore's secured creditor Alerus Financial; and an unrelated party who had seen the notice in Finance and Commerce. The IFS stock was sold to American Summit for $2,000. American Summit now contends that the IFS transfer to Hedstrom was compelled by Beardmore's plea of guilty to a felony which jeopardized several of the company's gaming licenses. American Summit further contends that the relevant stock purchase agreement was not signed until after the public sale discussed below and provided that the total consideration was "$1.00 and other good and valid consideration." To the extent that Beardmore now claims that Hedstrom provided a $2,000,000 note for the IFS shares, American Summit maintains that Beardmore has no expectation of ever collecting on the note.

On April 24, 2001, American Summit contends that it gave notice to Beardmore that it was exercising the Founders Option for the purchase of 250,000 Superior shares. Plaintiffs dispute the validity of the exercise, pointing to the Founders Option requirement that exercise is complete only upon notice <u>and</u> receipt of payment. *See* Founders Option Agreement, at 1, ¶ 3(d). The Founders Option further requires that, within five days of giving notice, the optionee deliver to the optionor a check for the shares being purchased. *See id.* at 2, ¶ 3(e). Plaintiffs represent that Beardmore has yet to receive any payment from American Summit on the Founders Option; however, by way of a May 3, 2001, letter to be described below, American Summit indicated that $250,000 was ready for tender, pursuant to Beardmore's payment instructions.

With respect to the Duckson Carlson Option, American Summit contends that it acquired the option on May 3, 2001, and by letter of that same date, notified Beardmore of its exercise of the option. In the letter, American Summit calculated its payment due on 1,250,000 of the

Superior shares by offsetting the amount due on the Beardmore/Founders Note. American Summit further indicated that when the remaining 750,000 shares became available, proper payment would be tendered, and all purchased shares would remain in escrow pending receipt of the requisite regulatory approval. Plaintiffs contest the exercise of the Duckson Carlson Option, maintaining that the option had to be exercised in full, could not be exercised by offsets, and was not in compliance with controlling securities and banking regulations.

On May 2, 2001, counsel for Beardmore, Briggs & Morgan contacted Todd Duckson, a member of Duckson Carlson and counsel for American Summit, and communicated that Beardmore was prepared to pay the remainder of the note in full. Counsel exchanged further voice mail messages throughout the day and into the morning of May 3. On May 3, 2001, Duckson advised Briggs & Morgan for the first time that American Summit was proposing to exercise the Duckson Carlson Option.

Concluding that American Summit had not and could not validly exercise either option at that time, Plaintiffs sent letters to American Summit on May 3 and 7, 2001, in order to schedule a time and place to pay the balance on the note. Plaintiffs maintain that American Summit refused to accept Plaintiffs' attempted payment of $1,963,211.86 on May 4 and 8, maintaining that the May 3, 2001, offset rendered the attempted payment excessive. Indeed, Plaintiffs represent that attorneys at Duckson Carlson declined to meet with members of Briggs & Morgan when counsel arrived at the Duckson Carlson offices to tender payment. American Summit contends, however, that the inclusion of a reservation of rights provision in Beardmore's May 4 and 7 payoff letters validates its refusal. The provision states in relevant part: "Beardmore is making payment of the Note under protest and hereby reserves all claims, actions, causes of action, rights and remedies

they may have regarding the Note . . .." The reservation of rights provision was not included in the May 3 letter or in the May 2 telephone communication.

Also on May 2, 2001, however, Beardmore negotiated with Thomas Kell a sale of 1,500,000 Superior Shares to three purchasers, now named as third-party defendants to the current action–999,500 shares to Richard Lefcowitz, 342,605 shares to Tantalon Group, Inc., and 157,895 shares to Todd Haugan–all at $1.26667 per share, yielding a total of $1,900,000. Thomas Kell, chairman of Superior and president of the Lake Bank, was to be paid a commission of $300,000 for negotiating the sale of Beardmore's Superior shares. In order to complete the transfer and because American Summit still held Certificate 33, Beardmore requested that a new certificate be issued. In support of his request, Beardmore's counsel, Briggs & Morgan wrote an opinion letter to Superior, dated May 15, 2001, explaining its conclusions that the relevant law and circumstances allowed for the cancellation of Certificate 33 and the issuance of a replacement certificate. On May 14, 2001, Kell canceled Certificate 33 and issued Certificate 42, evidencing the same 1,500,000 shares of Superior. Kell also issued Certificates 43 through 45 to the purchasers of Beardmore's Superior stock.

On June 18, 2001, American Summit amended its purchase agreement with Founders to reflect the following:

> 2.02 The Beardmore Shares
> The parties recognize that 1,500,000 shares of stock in Superior Financial Holding Corporation ("the Beardmore Shares") serve as partial collateral for the Promissory Note. Notwithstanding anything herein to the contrary, it is agreed and understood that nothing herein will give American Summit the right to directly or indirectly own, control or hold the power to vote or exercise any rights of control whatsoever in the Beardmore Shares or over Superior Financial until American Summit, or its assigns, receives all required regulatory approvals, including that of the Federal Reserve Bank, necessary for any such interest therein. The parties agree that no interest in the Promissory Note or the Beardmore Shares will transfer to American Summit that would require any prior

> state or federal regulatory approval. The parties further agree that this intent and understanding shall be incorporated by reference into the Bill of Sale and Assignment, the Escrow Agreement, the Promissory Note and the Security Agreement entered into by and between the parties hereto dated June 2, 2001.

Prior to this amendment, Duckson Carlson received, on behalf of its client American Summit, a letter from the Federal Reserve Bank, dated April 24, 2001, the same day American Summit purported to exercise the Founders Option. The Federal Reserve Bank's letter stated in relevant part that the Bank Holding Company Act of 1956 requires that American Summit "file a section 3(a)(1) application to become a bank holding company and obtain the Federal Reserve System's approval before it acquires the promissory note or enters into the proposed voting agreement." American Summit's application for federal approval was pending at the time of hearing.

From all this, the current action ensued. Plaintiffs filed their complaint contesting American Summit's sale of the IFS stock as "commercially unreasonable" and contending that American Summit wrongfully retained and converted Beardmore's Superior shares. By their Complaint, Plaintiffs seek declaratory relief (Count I) and allege: (1) Count II: Conversion; (2) Count III: Breach of Texas' Absolute Bar Rule; (3) Count IV and VII: Breach of Contract (against American Summit and Duckson Carlson respectively); (4) Count V: Tortious Interference with Existing and Prospective Contractual Relations; (5) Count VI: Violation of the Securities Exchange Act; and (6) Count VIII: Breach of Fiduciary Duty and Duty of Loyalty. In response, Defendant Duckson Carlson has raised numerous counterclaims against Plaintiff John Beardmore, some of which will be addressed below. And not to be left out of the mix, Defendant American Summit has brought a third-party complaint against Superior Financial; Briggs & Morgan; Tantalon Group, Inc.; Thomas P. Kell; Todd R. Haugan, and Richard Lefcowitz, alleging: (1) Count I: Illegal, Unauthorized and *Ultra Vires* Purported Cancellation

of Stock Certificate No. 33; (2) Count II: Illegal, Unauthorized and *Ultra Vires* Purported Issuance of Stock Certificate No. 42; (3) Count III: Recovery of Illegal, Unauthorized and *Ultra Vires* Purported Issuance of Certificates Nos. 43, 44, 45; (4) Count V: Conversion; (5) Count VI: Intentional Interference with Contractual Relationship; (6) Count VII: Violation of Minn. Stat. §§ 481.07 and 481.071; and requesting (7) Count IV: Injunctive Relief.

By the current motion before the Court, Defendant American Summit seeks summary judgment on all claims against it. By its Memorandum in Opposition to Defendant's motion, Plaintiffs seek summary judgment with respect to "all claims relating to Superior Financial's UCC § 8-405(a) replacement of Certificate No. 33 and Beardmore's transfer of these shares to Kell, Haugan and Lefcowitz."[5] However, Plaintiffs' failed to file a formal motion, and the Court declines to treat Plaintiffs' Opposition Papers as a proper motion. Effectively, Plaintiffs have limited Defendant American Summit's response to their motion to the space it had allotted for its reply brief. Moreover, Plaintiffs have failed to specifically delineate which counts, if any, such motion is intended to resolve. Upon a review of the Complaint and the parties' arguments currently before the Court, the Court finds that, to the extent that Plaintiffs intended to resolve each of the counts in their Complaint, Plaintiffs have failed to adequately brief the issues necessary for such resolution, and the Court declines to speculate upon Plaintiffs' mere suggestion. As such, the Court will address only Defendant American Summit's motion for summary judgment.

[5] Third-Party Defendant Superior Financial also opposes Defendant American Summit's motion for summary judgment and adopts the arguments articulated in Plaintiffs' memorandum in opposition to Defendants' motion for summary judgment.

## Discussion

### 1. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

### 2. Issues

It is the Court's view that the law is not a tool to be manipulated to achieve a desired end, but rather it should be a guide for our actions to ensure that we act responsibly as members of a shared community. Unfortunately, the circumstances of this case cause the Court great concern because there appears to be an allegiance toward the former principle rather than the latter. It is

the Court's view that such conduct should not be cloaked in the name of zealous advocacy when it so clearly seeks to exploit circumstances and the individuals affected by them. The Court will now attempt to unfold the convoluted series of events giving rise to the remaining claims of Plaintiffs in this action, and the Court will address each of the issues in turn.

**a. Replacement of Certificate 33**

Upon the urging of Plaintiffs and the legal opinion of Plaintiffs' counsel, Superior Financial issued a replacement stock certificate intended to supersede Certificate 33, and, almost immediately, Plaintiffs sold the shares represented by the replacement certificate to three buyers. Pursuant to Minn. Stat. § 336.8-405, the Minnesota codification of U.C.C. § 8-405(a), a new security may be issued if the original "has been lost, destroyed, or wrongfully taken." Plaintiffs contend that the issuance of the replacement certificate was legitimate because Certificate 33 had been "wrongfully taken" by American Summit on the following grounds: (1) that the Texas Absolute Bar Rule rendered the May 3 acquisition to be "wrongful"; (2) that the Duckson Carlson Option is void under the Securities Exchange Act; (3) that American Summit wrongfully refused the May 2-8 tender offers by the Beardmores; and (4) that American Summit failed to properly exercise the Duckson Carlson and Founders Options.

In pertinent part, Minn. Stat. § 336.8-405 states that:

* * *

(2) Where the owner of a security claims that the security has been lost, destroyed or wrongfully taken, the issuer must issue a new security in place of the original security if the owner

(a) so requests before the issuer has notice that the security has been acquired by a bona fide purchaser; and

(b) files with the issuer a sufficient indemnity bond; and

(c) satisfies any other reasonable requirements imposed by the issuer.

(3) If, after the issue of the new security, a bona fide purchaser of the original security presents it for registration of transfer, the issuer must register the transfer unless registration would result in overissue, in which event the issuer's liability is governed by section 336.8-104. In addition to any rights on the indemnity bond, the issuer may recover the new security from the person to whom it was issued or any person taking under him except a bona fide purchaser.

Minn. Stat. § 336.8-405.

As a preliminary matter, the Court finds that American Summit has no standing to challenge Superior Financial's decision not to require an indemnity bond. The purpose of such a bond is to protect the interests of the issuer, not third-parties. 11 *Fletcher Cyclopedia on the Law of Private Corporations* § 5180 (Perm. Ed. 1995) (hereinafter "*Fletcher*"). While third-party interests may be ultimately protected in the event that the issuer may become liable for injury to a third-party bona fide purchaser, the bond is an instrument the issuer may chose to use to protect against that risk. As such, it is within the discretion of the issuer to determine whether and to what extent a bond is necessary to protect against the risks involved in issuing a replacement certificate. *Id.*

Upon a reading of the statute, in conjunction with the Minnesota Code comments and Minnesota case law involving replacement stock certificates, "wrongfully taken" is generally understood to mean stolen. *See, e.g., In re Bame*, 252 B.R. 148 (Bankr. D. Minn. 2000) (replacement of lost or misplaced certificate); *American Sur. Co. of New York v. Cunningham*, 275 N.W. 1 (Minn. 1937) (replacement of lost certificate based on common law principle that lost or stolen certificates may be replaced upon proof of ownership). *See also*, Minn. Stat. § 336.8-405, Minnesota Code Comment (interchanging "wrongfully taken" with "stolen"). Given that the Beardmores, American Summit, Founders, Superior Financial, and all counsel involved

in this case were well aware that Certificate 33 had been pledged voluntarily as collateral for the Founders loan which was ultimately assumed by American Summit, to argue that the whereabouts of the certificate were unknown or that the certificate had somehow been "stolen" rings hollow with the Court. Instead, Plaintiffs have resorted to arguing that the Certificate has been wrongfully "retained" by American Summit, apparently resulting in conversion. While Plaintiffs may have viable arguments against Defendants with respect to their alleged faulty exercise of the Duckson Carlson and Founders Options and their repudiation of the Beardmores' offers of tender, the Court does not find such complaints to justify the reissuance of Certificate 42.

Certificate 33 was neither lost, destroyed, nor stolen. Plaintiffs cite to only one treatise which purportedly supports their position:

> By the use of "wrongfully taken" the Code avoids the necessity of determining whether the taking constitutes a crime or of classifying the crime. It embraces any taking that is not rightful with respect to the original owner, whether the taking is described by non-Code law as larceny, embezzlement, theft, misapplication of trust funds, or breach of fiduciary duty.

8A *Anderson on the Uniform Commercial Code*, § 8-405:10 (3d rev. ed. 1996). However, even Anderson notes that: "U.C.C. § 8-405 authorizes the replacement of a security that has been stolen. This is described in the Code as a security that has been 'wrongfully taken.'" *Id.* While the Court recognizes that "wrongfully taken" was intended to include more than criminal theft, the Court does not read the statute nor any of its interpretations and previous applications to extend to the circumstances at hand.

Even if American Summit improperly exercised either or both options or if its conduct resulted in an improper sale of the IFS shares or repudiation of valid tender, the Court finds the issuance of the replacement certificate to be improper. American Summit had a valid security

interest in the stock, and if it should have relinquished such interest upon any or all of the Beardmores' attempts to tender payment, then the Beardmores could have maintained a viable action against American Summit for conversion. However, even within their arguments opposing Defendant American Summit's current motion, Plaintiffs recognize the disputed nature of the status of the loan and its collateral, positing that American Summit's motion was premature and that further discovery is likely necessary to resolve certain issues, *e.g.*, the efficacy of the sale of IFS stock. While the Court recognizes that such statements may simply be made in the alternative to at least fend off an adverse judgment, the Court finds that the circumstances surrounding the Beardmore loan were so murky as to render the decisive conduct of reissuance to be inappropriate. What was abundantly clear to American Summit, and now to the Court, is the whereabouts of the original certificate and the competing claims against it.

The Court finds that the replacement certificate was improperly issued. However, the parties have failed to direct the Court to sufficient evidence in the record to determine whether the three purchasers–Lefcowitz, Haugan, and the Tantalon Group–were bona fide purchasers, such that the replacement certificate should not be invalidated. Accordingly, the Court finds that sufficient dispute remains with respect to whether the replacement shares were sold to bona fide purchasers, and, as such, the Court declines to invalidate the replacement certificate at this time. Nonetheless, the practical effect of the Court's determination is immaterial because as the Court will discuss below, the Beardmores should retain ownership of Certificate 33.

**b. Option Agreements**

An option agreement provides the optionee an opportunity to purchase stock within a certain time period. 12A *Fletcher* § 5575 (Perm. Ed. 2001). If the optionee accepts that offer within the time period and according to the terms of the agreement, then the agreement becomes

a binding contract between the parties. *Id.* *See also Nafstad v. Merchant*, 228 N.W.2d 548, 550 (1975); *Kenver Corp. v. Robinson*, 492 S.W.2d 317, 319-20 (Tex. App. 1973). Accordingly, the Court must interpret the option agreement as it would any other contract and thus look first to the plain language of the agreement. *See American Commerce Ins. Brokers, Inc. v. Minnesota Mut. Fire & Cas. Co.*, 551 N.W.2d 224, 227-28 (Minn. 1996); *Frady v. May*, 23 S.W.3d 558, 564 (Tex. App. 2000). To the extent that the Court finds any ambiguity, then the Court must construe the language strictly in favor of the maker. *See Abrahamson v. Abrahamson*, 613 N.W.2d 418, 423 (Minn. Ct. App. 2000) (citations omitted).

**i. Founders Option**

The Founders Option states in relevant part that: "Method of Exercising Options. Upon notice by Optionee of their intent to exercise and by Optionor of his receipt of the Option Payment, Optionor will promptly release the share certificate to Optionee . . .." The Agreement had a further provision which stated: "Payment for and Delivery of Shares. The Optionee shall, within five days of his giving notice, deliver a check in the amount of Option Price for the shares being purchased. Immediately upon such payment, Optionor will deliver the Optioned Shares to Optionee." The Founders Option is governed by Texas law.

American Summit contends that it was only required to give notice in order to exercise the option. To the contrary, Plaintiffs maintain that exercise does not occur until both notice and payment are made. The parties also dispute when the attempted exercise occurred. Plaintiffs maintain that it occurred simultaneously with the purported Duckson Carlson exercise, while American Summit maintains that it exercised the Founders Option separately on April 24, 2001.

The Court finds the plain language of the Founders Option to require both notice and payment to effectuate a proper exercise of the option. The fact that the agreement also contains a

provision scheduling by when the payment must be received does not compromise the plain language of the exercise provision. Instead, the five-day window allows for the practical obstacles that may result in attempting to render both notice and payment simultaneously. Effectively, for purposes of the agreement, the parties have defined "simultaneously" as "within 5 days." There is no evidence or contention before the Court that American Summit attempted to tender such payment within the five-day period nor even after the window had expired. To the extent that American Summit was withholding payment pending regulatory approval, there is no evidence or contention before the Court that the required payment was placed in escrow or made by some alternative arrangement. The fact that Texas law does not require more than notice to exercise an option is not dispositive here because the plain language required more than notice, a negotiable requirement also supported by Texas law. Accordingly, the Court finds that American Summit failed to properly exercise the Founders Option by simply providing notice of its acceptance.

**ii. Duckson Carlson Option**

The Duckson Carlson Option states in relevant part:

> 1.2 Manner of Exercise. Subject to the terms and conditions of this Agreement, the Grantee may exercise the Option by providing written notice of such exercise and payment of one dollar and fifty cents ($1.50) per share for a total of three million ($3,000,000) dollars ("the Option Consideration") to Grantor at the address above stated.

In addition, the agreement outlines the parties' relative obligations at closing, including that "Grantor shall deliver all documents . . . evidencing ownership of the shares . . ." and that "Grantee shall deliver . . . to the Grantor the Option Consideration due at closing."

Again, the Court reads the plain language of the agreement to require both notice and payment to effectuate a proper exercise. To read both the closing and the exercise provisions to

include the requirement of complete payment does not render either provision void. Essentially, the parties have agreed that exercise and closing will occur at the same time. While American Summit arguably gave sufficient notice of its intent to exercise the option, complete payment was not made. However, American Summit represented to Plaintiffs that payment was available and would be directed appropriately upon their instructions. There is no evidence before the Court that Plaintiffs ever gave such instructions, but rather they contested the manner of exercise by a May 3, 2001, letter from counsel attempting to tender payment on the note, collect the collateral, and then receive a full cash payment for shares purchase, assuming the exercise and option agreements were valid. Such disputes arguably weigh in favor of withholding summary judgment.

However, the fatal flaw in American Summit's attempted exercise is its unilateral decision to offset the purchase price of the shares by resolving the outstanding debt on the loan. American Summit informed the Beardmores of this decision by a May 3, 2001, letter that had been drafted by its counsel, Duckson Carlson. One day before, however, Duckson Carlson spoke to Plaintiffs' counsel, Briggs & Morgan, and learned of the Beardmores' desire to tender full payment on the note. While the Court will discuss the tender offers in further detail below, at least with respect to exercise of the Duckson Carlson option, American Summit was well aware of the debtors' interest and ability to tender a cash payment on the note and thus was without authority to simultaneously make the decision to make partial payment on the option shares by offset.

Moreover, while American Summit was not entitled to determine the method of payment contrary to the method requested by the optionor, by considering the purchase to have been

completed in part, American Summit then had no right to hold Certificate 33 in escrow. Under Regulation Y, § 225.12(e):

> The following transactions do not require the [Federal Reserve] Board's approval under Sec. 225.11 of this subpart:
>
> * * *
>
> (e) Holding Securities in Escrow. The holding of any voting securities of a bank or bank holding company in an escrow arrangement for the benefit of an applicant pending the Board's action on an application for approval of the proposed acquisition, if title to the securities and the voting rights remain with the seller and payment for the securities has not been made to the seller.

12 C.F.R. § 225.12(e). Because American Summit claims to have satisfied payment at least in part, it then had no right to hold the securities in escrow absent approval from the Federal Reserve Board. There is no evidence before the Court that any such approval was sought and obtained. While the Court recognizes that the exercise by notice and payment and the process of obtaining regulatory approval make for a complicated transaction, the parties could have negotiated an escrow arrangement for the intended payment, pending approval, such that all requirements were satisfied. No such arrangement was sought in this case. Instead, it appears that both parties acted rashly and defensively in order to avoid the option being used against them, whether by exercise or rescission. Nevertheless, the Court finds that the conduct of American Summit resulted in an improper exercise of the Duckson Carlson option.

Plaintiffs also argue that the Duckson Carlson Option was void because Duckson Carlson was improperly acting as a broker in violation of relevant securities laws. Specifically, Plaintiffs refer to the provision in the Duckson Carlson Option which states:

> Grantor [Beardmore] shall pay to Grantee [Duckson Carlson] for its normal hourly fees, as well as out-of-pocket expenses incurred, in soliciting third party to purchase the Shares (the "Fees"). The parties agree that in no event shall the

> Grantor be responsible for such fees in excess of fifty thousand ($50,000) dollars or if the Option is not exercised.

Under 18 U.S.C. § 78cc(b) or § 29(b) of the Securities Exchange Act, a contract made in violation of any provision of the Securities Exchange Act renders such contract void or voidable by the non-violating party. *See Greater Iowa Corp. v. McLendon,* 378 F.2d 783, 792 (8th Cir. 1967); *Reserve Life Ins. Co. v. Provident Life Ins. Co.*, 499 F.2d 715, 726 (8th Cir. 1974). Title 18 U.S.C. § 78o(a)(1) states that: "It shall be unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to affect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section." According to 18 U.S.C. § 78c(a)(4), a "broker" is "any person engaged in the business of effecting transactions in securities for the account of others, but does not include a bank." While Plaintiffs have arguably established that Duckson acted in violation of § 78o(a)(1), the Court has been presented with insufficient evidence to determine whether equity otherwise requires the contract to be upheld. In keeping with the holding that Plaintiffs rely on for their position, and irrespective of the parties' failure to focus on the issue the Court now finds to be relevant, the Court finds there to be a dispute of fact as to whether Beardmore was aware of Duckson's status as an unregistered broker and accordingly whether such circumstances constitute an equitable defense. *See Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*, 678 F.2d 552, 562-63 (5th Cir. 1982).

With respect to Plaintiffs' argument that American Summit admitted ineffective exercise of the options by its representations to the Federal Reserve Board and amendment to the Founders purchase agreement that American Summit claimed no interest in the shares, the Court

does not find such statements to be determinative. Rather, such statements indicate to the Court that American Summit was tentative of its position and was cautious of asserting any voting or dispensatory control over the shares. As the Court has found, American Summit's position was indeed tentative, however, its understanding of the situation is not what renders its conduct improper, but, rather, it is the conduct itself.

**c. Repudiation of Tender Offers**

In general, when a creditor improperly refuses tender, the result is that the creditor may be liable for conversion of the collateral. 12A *Fletcher* § 5679 (Perm. Ed. 2001). American Summit maintains that its repudiation of the tender offers made by the Beardmores was justified because the note had already been satisfied by the offset and, moreover, that the Beardmore offers were made under protest. First, based on the evidence before the Court, the purported offset was only communicated to Plaintiffs by the Duckson Carlson May 3, 2001, letter, one day *after* Plaintiffs counsel informed counsel for American Summit that the Beardmores were prepared to pay the note in full. Second, as the Court has already discussed above, given Defendant's knowledge that Plaintiffs were prepared to pay the note in full, the purported offset was improper.

Finally, American Summit's current argument that the tender was refused because it was made in protest and with a provision reserving Plaintiffs' rights is disingenuous. No such provision was communicated to American Summit by the May 2 tender offer, and Defendant's counsel refused the May 4 tender offer without even speaking to Plaintiffs' counsel nor reading the letter containing the relevant provision. To construct an argument for repudiation in retrospect ignores a creditor's obligation to communicate its objection at the time of repudiation.

*See Sellwood v. Equitable Life Ins. Co. of Iowa*, 42 N.W.2d 346, 353 (Minn. 1950); *Gaunt v. Alabama Bound Oil & Gas Co.*, 281 F. 653, 655 (8th Cir. 1922).

Nonetheless, even if American Summit was aware of the reservation of rights provision upon its repudiation of the tender offers, its repudiation still would not be justified. Offering tender under protest does not invalidate the tender by imposing a condition upon a creditor's receipt of such tender. *See, e.g., Chicago R.I. & P., Ry. Co. v. Chickasha Nat'l Bank*, 174 F. 923, 932 (8th Cir. 1909); *Mutual Life Ins. Co. of N.Y. v. Hilander*, 403 S.W.2d 260, 264 (Ky. 1966). Rather, such a provision provides the creditor with notice of the debtor's dispute, a dispute that is not resolved, however, by the creditor's receipt of the tender. *Mutual Life*, 403 S.W.2d at 263-64 (citing 52 Am. Jur. *Tender* § 24); *Jaynes v. Heron*, 130 P.2d 29, 33-34 (N.M. 1942). If, however, the debtor were to attach a condition such as a release of rights upon acceptance of the tender, then the creditor could be justified in refusing to accept tender. *Id.* No such term or condition was imposed by Plaintiffs in this case. Accordingly, the Court finds that American Summit improperly refused to accept the Beardmores' offers of tender.

**d. Sale of IFS Shares**

Plaintiffs contest the sale of Beardmores' IFS shares, claiming that the sale was commercially unreasonable, in violation of the Texas Absolute Bar Rule, and that the shares were sold in violation of a letter agreement between the parties. Under Texas law, failure by the secured party to conduct a "commercially reasonable" sale is an absolute bar to recovery of a deficiency judgment. *See Greathouse v. Charter Nat'l Bank-Southwest*, 851 S.W.2d 173, 176 (Tex. 1992); Tex. Bus. & Com. Code § 9.504. The obligation of reasonableness may not be waived by agreement; however, "parties may by agreement determine the standards by which performance of such obligations is to be measured if such standards are not manifestly

unreasonable." Tex. Bus. & Com. Code § 1.102(c) & 9.501(c). By the February 22, 2001, letter agreement, Beardmore and Founders agreed as to how the sale should proceed. Beardmore made no attempt upon notification of the impending sale to request publication of the sale in any newspaper other than those listed in the agreement; yet, American Summit published in newspapers beyond those agreed upon and further notified all IFS shareholders of record. While the location of the sale in Texas is obviously a provision negotiated for the benefit to Founders, such a provision does not automatically render the sale commercially unreasonable. The Court is not persuaded by Plaintiffs' contention that the February 22, 2001, letter agreement was "plainly overreaching and resulted in a manifestly unreasonable standard." However, to the extent that Plaintiffs also challenge the reasonableness of the sale based on American Summit's alleged delay in notifying Plaintiffs of the amount owed and the inclusion of a contested amount for attorneys' fees, the Court finds that disputes of fact remain with respect to whether the sale was reasonable.

Plaintiffs also contend that American Summit breached the February 22, 2001, letter agreement by selling the IFS stock before the sale of the Superior Financial shares. The letter states in relevant part that:

> In response to our letters dated February 14, 2001, you [Beardmore] have requested that we postpone the sale of the collateral securing the note payable in the original principal amount of 2,500,000 ("Note Payable") that is currently in default. You have indicated that you have an interested buyer of the 1,500,000 Shares of Superior Financial Holding Corp. and have requested until March 5, 2001, to close that transaction or deliver a binding contract for its sale. . . .
>
> * * *
>
> 2. You hereby acknowledge that the terms of the proposed sales are commercially reasonable. . . . You have requested that we first sell the 1,500,000 Shares of Superior Financial Holding Corp. no earlier than March 15, 2001, and that if such

> sale does not generate proceeds to satisfy the debt, that we then sell the 1,500,000 Shares of Innovative Financial Systems, Inc. no earlier that April 5, 2001. If the proceeds from the collateral sales do not satisfy the debt, you hereby agree to be fully responsible for any deficiency balance.
>
> If (i) the sale of 1,500,000 Shares of Superior Financial Holding Corp. to satisfy the debt is not consummated by March 5, 2001 or (ii) the receipt of an executed binding contract for sale of 1,500,000 Shares of Superior Financial Holding Corp. subject only to Federal approval to satisfy the debt is not received by March 5, 2001, we shall proceed with the sale of the collateral outlined above.

The language relating to Beardmore's request of the order of sales mirrors his request rather than states an affirmative obligation. However, the Court finds that, reading the letter as a whole, American Summit agreed to Beardmore's request, and thus failed to meet its obligation to attempt a sale of the Superior Financial shares before selling the IFS stock. That being said, however, such a breach does not alter the Court's analysis set forth above with respect to whether the replacement certificate was properly issued.

**e. Conclusion**

In sum, the Court has concluded that the replacement certificate was improperly issued, but that the practical effect may be immaterial because of the Court's concomitant finding that control of the original certificate should revert to the Beardmores. That being said, however, it is of significant concern to the Court that Plaintiffs appear to conveniently ignore that Superior Financial apparently granted the Beardmores a colossal windfall. Despite defaulting on an indisputably sizable loan, Plaintiffs have been enabled to profit from selling the very collateral they relinquished as security for the defaulted loan. By finding that control of the original certificate should revert to the Beardmores, the Court by no means intends for the Beardmores to be absolved of any valid contractual obligations, including their liability on the note. Moreover, the Court finds it of significant concern that the parties, with the assistance of counsel, all

attempted to exploit the law to vie for control of the Lake Bank, an institution that, under the law, is expected to operate according to certain fiduciary duties. However, the conduct of all parties in this case would appear to belie the very trust upon which such institutions are founded.

To the extent that Defendant American Summit's motion for summary judgment attempted to move the Court, implicitly or otherwise, to dispose of all counts in Plaintiff's Complaint, Defendant's motion is denied. The parties failed to adequately brief each of the counts purportedly addressed by the current motion, and, as such, the Court has limited its ruling to declaratory relief relating to the issues properly presented to the Court. While the Court's decision arguably may determine the fate of certain counts in the Complaint, the parties have failed to move properly for their dismissal or retention, and the Court declines to take such action *sua sponte*.

For the reasons stated, **IT IS HEREBY ORDERED** THAT:

1. Defendant American Summit's Motion for Summary Judgment (Docs. No. 32 & 46) is **GRANTED IN PART** and **DENIED IN PART** consistent with the Court's Memorandum Opinion, such that:

   a. Minn. Stat. § 336.8-405 was improperly invoked to justify the issuance of replacement Certificate 42;

   b. American Summit did not properly exercise the Founders Option or the Duckson Carlson Option; and

c. Ownership of Certificate 33 should revert to Beardmore.

Dated: April 5, 2002

DONOVAN W. FRANK
Judge of United States District Court