**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| John R. Beardmore, Kathrine A. Beardmore and Terry Hedstrom,<br><br>Plaintiffs,<br><br>v.<br><br>American Summit Financial Holdings, LLC, and Duckson, Carlson, Bassinger & Mitchell, LLC,<br><br>Defendants/Third Party Plaintiffs,<br><br>vs.<br><br>Thomas P. Kell, Todd R. Haugan and Richard Lefcowitz,<br><br>Third-Party Defendants. | Court File No.: 01-CV-948 (DWF/SRN)<br><br>**AMENDED AND SUPPLEMENTAL THIRD PARTY COMPLAINT OF AMERICAN SUMMIT**<br><br>**JURY TRIAL DEMANDED** |

American Summit, for its Amended and Supplemental Third-Party Complaint against Third-Party Defendants above named states and alleges as follows:

**SUMMARY OF ACTION**

This is an action for conversion, breach of fiduciary duty and negligence against the shareholders of a bank holding company for a campaign to frustrate, ignore and destroy the rights and privileges of Third Party Plaintiff American Summit Financial Holdings corporation.

**PARTIES**

1. American Summit Financial Holdings, LLC (“American Summit”), is a Minnesota limited liability company having its principal place of business in Eden Prairie, Minnesota.

2. Duckson, Carlson, Bassinger & Mitchell, LLC (“DC”), is a Minnesota limited liability company having its principal place of business in Minneapolis, Minnesota.

3. Superior Financial Holding Corporation ("Superior") is a Minnesota corporation having its principal office and place of business in Two Harbors, Minnesota.

4. Todd Haugen ("Haugen") is a Minnesota resident and is or was a shareholder and director of Superior.

5. Thomas P. Kell ("Kell") is a Minnesota resident and is or was the president, a shareholder and director of Superior, and was the president and a director of The Lake Bank.

6. Richard Lefcowitz ("Lefcowitz") is, on information and belief, a Wisconsin resident, and is or was a shareholder of Superior.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this action under 28 U.S.C. § 1367.

8. Venue is proper in this district in that a substantial part of the events or omissions giving rise to the claims occurred in Minnesota.

**STATEMENT OF FACTS REGARDING EVENTS OCCURRING BEFORE THE THIRD-PARTY COMPLAINT WAS FILED**

9. In early September 1999, John Beardmore ("Beardmore") acquired 3,000,000 shares of common stock of Superior, a bank holding company whose sole asset was The Lake Bank, a bank located in Two Harbors, Minnesota.

10. Also in early September 1999, Duckson, Carlson, Bassinger & Mitchell, LLC ("DC") acquired 300,000 shares of common stock in Superior.

11. In connection with the acquisition of Superior stock, DC, Beardmore and Mark A. Smith entered into an Investment Agreement dated September 13, 1999 ("Investment Agreement").

12. The Investment Agreement contained the following provision:

> **4. Take Along Clause**. In addition to the other rights granted herein, in the event that a bona fide offer is made by a third party (or parties as part of a single or unified transaction) for the purchase of a majority of the issued and outstanding shares of stock in the Corporation held by Smith or Beardmore (the "Offer"), DC shall have the same right and option as Smith and Beardmore to sell their shares to such third party or parties, on a pro-rata basis with Smith and Beardmore, pursuant to the terms of the Offer. Smith and Beardmore hereby agree to give DC reasonable notice of any such Offer and to otherwise cooperate with DC in carrying the intention of this right and option.

13. The Investment Agreement also contained a Put Option whereby DC could require Beardmore to purchase DC's 300,000 shares at a price set forth in the Investment Agreement ("DC Put Option").

14. In order to finance the acquisition of his Superior shares, Beardmore borrowed $2,500,000 from Founders Equity Group, Inc. ("Founders"). To evidence this obligation Beardmore and his wife, Katherine A. Beardmore (together "Beardmores") made, executed and delivered to Founders a Promissory Note dated September 8, 1999 in the original principal amount of $2,500,000 (the "Note").

15. Repayment of the obligations evidenced by the Note was secured by a Pledge Agreement dated September 8, 1999. In the Pledge Agreement, Beardmore granted a security interest in (a) 2,500,000 shares of Superior common stock and (b) 1,500,000 shares of Innovative Financial Systems, Inc. ("IFS").

16. The common stock of Superior and the common stock of IFS are both closely held and there is no established market for either.

17. Superior at the time owned 100% of the issued and outstanding common stock of The Lake Bank, N.A., a federally chartered bank having its principal offices in Two Harbors, Minnesota.

18. As additional security for repayment of the obligations under the Note, the Beardmores executed and delivered to Founders a Statutory Mortgage, Assignment of Rents and Profits, Security Agreement and Fixture Financing Statement effective as of September 8, 1999 concerning certain real property in Douglas County, Minnesota (the “Douglas County Mortgage”).

19. As additional security for repayment of the obligations under the Note, the Beardmores also executed and delivered to Founders, as trustee and beneficiary, a Deed of Trust and Security Agreement and Fixture Filing dated as of September 8, 1999 concerning certain real property in Maricopa County, Arizona (the “Maricopa County Deed of Trust”).

20. As additional consideration for Founders’ making the loan to the Beardmores, Beardmore and Founders entered into an Option Agreement dated as of September 13, 1999 (the “Founders Option”). In the Founders Option, Beardmore granted Founders an option to purchase 250,000 shares of common stock of Superior exercisable at $1.00 per share.

21. On information and belief, Founders released its security interest in 1,000,000 shares of Beardmore’s common stock in Superior so that such shares could be sold to an ESOP of The Lake Bank. Subsequent to the sale, Superior issued Stock Certificate No. 33 to Beardmore in the amount of 1,500,000 shares. Beardmore delivered Stock Certificate No. 33 to Founders as required by the Pledge Agreement.

22. Beardmore defaulted under the Note by failing to repay in full amounts due to Founders under the Note by the due date of September 8, 2000.

23. In response to Beardmore’s default under the Note, Founders gave him notice of its intent to sell the remaining 1,500,000 shares of Superior evidenced by Certificate No. 33.

24. On information and belief, in February, 2001, Beardmore approached DC about his desire to sell his 1,500,000 shares. Beardmore knew that DC had been instrumental in organizing the investor group that had acquired the stock in Commercial State Bancorporation in 1999 and that DC was also a shareholder. DC also represented clients that had expressed interest in Beardmore's shares.

25. In February, 2001, Beardmore and DC entered into an Option Agreement whereby Beardmore granted DC an option to purchase Beardmore's remaining 2,000,000 shares of Superior for $1.50 per share ("DC Option").

26. On information and belief, Beardmore transferred his stock in IFS to Plaintiff Hedstrom.

27. On February 14, 2001, Founders twice notified Beardmore of the default under the Note and of Founders' intent to liquidate the stock in Superior and IFS.

28. On February 16, 2001, Founders provided Beardmore with a notice of sale for February 28, 2001 and informed Beardmore in writing of the persons Founders intended to notify of the sales of the Superior stock and the IFS stock. Founders also requested Beardmore's comments to the proposed form of notice.

29. On information and belief, Beardmore neither provided additional names nor provided comments to the form of notice. Instead, Beardmore contacted Founders to request an extension of the foreclosure sale of the Superior stock.

30. In a letter agreement dated February 22, 2001 (the "February 22 Agreement"), Founders agreed that the sale would not occur prior to March 15, 2001. In return, Beardmore acknowledged the following:

> He owed $1,846,620.75 to Founders, that the Note was past due, that he had received notice of the default and the proposed collateral sale.
>
> Notice of the public sale would be commercially reasonable if published in the Dallas Morning News and one other paper if Beardmore should so request.
>
> Beardmore would provide Founders with the names of any potential purchasers of the collateral so they may be notified of the proposed sale.

31. On information and belief, Beardmore did not provide Founders with the names of any additional potential purchasers.

32. Beardmore was unable to accomplish a sale of his Superior shares by the March 15, 2001 deadline in the February 22 Agreement and requested an additional extension until March 30, 2001.

33. In a letter agreement dated March 15, 2001, Founders and Beardmore agreed that the sale of the collateral would not occur before March 30, 2001.

34. The default under the Note was not cured by March 30, 2001 and no further extensions were granted by Founders.

35. In early April 2001, American Summit entered into an agreement with Founders to acquire the Note and the collateral securing it. The original of the Note, Pledge Agreement, Douglas County Mortgage, Maricopa Deed of Trust, and Superior Stock Certificate No. 33 were delivered to DC to hold in trust pending regulatory approval for the transfer of the Superior shares.

36. American Summit promptly provided a draft application, pursuant to Section 3(a)(1) of the Bank Holding Company Act of 1956, to the Federal Reserve Board in

Minneapolis for comment on its request for prior approval to form a bank holding company to purchase the Superior shares.

37. On information and belief, at the time American Summit was negotiating with Founders to acquire the Note, Thomas Kell, president, director and minority shareholder of Superior and president and director of The Lake Bank, was also attempting to acquire the Note from Founders on behalf of himself and other "investors." On information and belief, these investors included Kell or an entity of which he was president, Todd Haugen, and Richard Lefcowitz.

38. Subsequent to the agreement between Founders and American Summit, American Summit attempted to negotiate a settlement with Beardmore. No agreement was reached.

39. On April 11, 2001, American Summit gave the Beardmores written notice of a public sale to be held on April 27, 2001 for 1,500,000 shares of IFS.

40. Written notice was also given to all of the individuals identified in Founders letter to Beardmore of February 16, 2001. In addition, written notice was given to Randy Newman (First National Bank North Dakota), Jeff Betchwars (First Commercial Bank), and Tom Kell (The Lake Bank). These banks were notified because they had filed financing statements naming Beardmore as debtor.

41. The Notice of Public Sale was published on April 17, 19, 21, 24, and 26, 2001 in Finance and Commerce.

42. The Notice of Sale was also published in the Dallas Morning News on April 17, 19, 22, 24, and 26, 2001.

43. On or about April 24, 2001, American Summit received an assignment of the Founders Option from Founders. On April 24, 2001, American Summit notified Beardmore's counsel that it was exercising the Founders Option.

44. The public sale of Beardmore's 1,500,000 shares of IFS was held on April 27, 2001. Six individuals attended the sale.

Paul Thissen, attorney for Beardmore and Hedstrom
Terry Hedstrom, purported new owner of the shares
Michael McVay, for American Summit
Mark Smith, a shareholder of IFS
Bob Fossum, a representative of First National Bank North Dakota
Marc Kiewel, a member of the public

45. There were two bidders for the IFS stock. Mark Smith bid $1,000. Michael McVay bid $2,000. There were no other bidders.

46. Despite the fact that an attorney for Beardmore was present and despite the fact that Hedstrom, the purported owner of the IFS stock, was present, neither entered a bid.

47. At no time did Beardmore or Hedstrom seek to enjoin the sale.

48. On or about May 3, 2001, DC assigned the DC Option Agreement to American Summit. Notice of exercise of the DC Option was provided to Beardmore's counsel on May 3, 2001.

49. Beardmore refused to acknowledge American Summit's exercise of the two option agreements and instead Beardmore attempted to terminate the DC option.

50. The purchase price for the two options was paid by a setoff against the Note and by a tender of cash. Beardmore claims to have tendered, on May 4, 2001, a full payoff of the Note and demanded in return delivery of Certificate 33 and the IFS shares that were sold under the April 27 public sale.

51. On information and belief, the funds purportedly tendered by Beardmore came from Lefcowitz, Haugen and Kell, with Lefcowitz advancing the largest amount - $1,700,000.

52. American Summit refused to authorize delivery from the escrow of Certificate 33 to Beardmore because Certificate 33 represented 1,500,000 of the 2,000,000 shares included by the exercised DC Option and the Founders Option.

53. On or about May 2, 2001, Beardmore entered into three stock purchase agreements to sell an aggregate of 1,500,000 shares of Superior stock to the following individuals and entities for a total purchase price of $1,900,000:

> Todd Haugen, an attorney at law, shareholder and board member of Superior – 157,895 shares @ $1.26667 per share, $200,000 total price.
>
> Tantalon Group, Inc., a corporation of which Thomas Kell was the president – 342,605 shares @ $1.26667 per share, $433,965 total price.
>
> Richard Lefcowitz, a friend of Kell, 999,500 shares @ 1.26667 per share, $1,266,035 total price.

54. In each of the three purchase agreements, Beardmore made the following representation and warranty:

> Seller has full power and authority to execute, deliver and perform this Agreement and no consent or approval of, giving of notice to, registration with or taking of any other action in respect of, any state, federal or other governmental authority or agency or any third party is required with respect to the execution, delivery or performance of this Agreement by Seller, except that Seller is required to notify Duckson, Carlson, Bassinger and Mitchell, LLC ("Duckson") of any bona fide offer made by a third party for the purchase of a majority of the shares of stock of Superior Financial Holding Corporation owned by Seller pursuant to the terms of that certain investment agreements Dated as of September 13, 1999, by and between Duckson, Seller and Mark A. Smith (the "Investment Agreement").

55. Beardmore did not give DC the notice referred to in paragraph 4 of the Investment Agreement.

56. On information and belief, by letter dated May 10, 2001, without notice to Founders, DC, or American Summit, Beardmore requested that Kell, as president of Superior, cancel Certificate No. 33 and reissue a new certificate to Beardmore for said shares, ostensibly under the authority of Minn. Stat. §§ 336.8-403, 336.8-404, and 336.8-406.

57. On information and belief, on or about May 15, 2001, Beardmore provided Superior with an Indemnification Agreement dated May 15, 2001 ("Indemnification Agreement"), an opinion letter issued by the law firm of Briggs and Morgan, and an affidavit of Beardmore.

58. Beardmore, Tantalon, Kell, Haugen and Leftcowitz knew since at least April, 2001, that Founders held a validly perfected security interest in 1,500,000 shares of Beardmore's common stock in Superior as collateral for the Note and that American Summit had acquired certain rights in the Note from Founders.

59. On information and belief, Kell signed the Indemnification Agreement on behalf of Superior without board approval while at the same time acting as agent for the three purported purchasers.

60. On information and belief, and without notice to Founders, DC or American Summit, in May Superior purportedly cancelled Certificate 33, notwithstanding the fact that Certificate 33 has never been surrendered to Superior.

61. Accordingly, after American Summit paid more than $2 million to acquire shares in Superior, Third-Party Defendants negligently and/or intentionally deprived American Summit of its rights as a shareholder, including the right to ensure that The Lake Bank had appropriate underwriting and lending policies in place and appropriately monitored its lending portfolio.

62. On information and belief, on May 14, 2001, and before ever receiving the bond required by Minn. Stat. § 336.8-405, Kell issued Beardmore a new Certificate No. 42 for 1,500,000 shares, and thereafter, on May 15, 2001, cancelled Certificate No. 42.

63. On information and belief, Beardmore submitted a stock power to Kell dated May 15, 2001 authorizing Kell to transfer the 1,500,000 shares purportedly represented by Certificate No. 42 to Todd R. Haugen for 157,895 shares, to Richard Leftcowitz for 999,500 shares and to Tantalon Group, Inc. for 342,605 shares.

64. On information and belief, Kell caused Superior to cancel Certificate No. 42 and issued the following new certificates:

Certificate No. 43 to Todd R. Haugen for 157,895 shares
Certificate No. 44 to Richard Leftcowitz for 999,500 shares
Certificate No. 45, not to Tantalon Group, Inc. but to Thomas Kell for 342,605

65. American Summit and DC first became aware that Beardmore had attempted to replace Certificate No. 33 under the purported authority of Minn. Stat. § 336.8-405 when Beardmore served his complaint on DC in the above action.

66. On June 1, 2001, American Summit brought a motion for a temporary restraining order seeking to prevent Beardmore from transferring his stock. It was at a telephone hearing on the temporary restraining order that American Summit and DC first learned that the transfers to the three purchasers had been completed. The Court directed counsel for Beardmore to deliver the relevant documents to DC so that DC could determine whether its request for a temporary restraining order was moot.

67. On June 18, 2001, Briggs and Morgan, counsel for Beardmore, confirmed to counsel for American Summit for the first time that no bond had been obtained.

**STATEMENT OF FACTS REGARDING EVENTS OCCURRING AFTER THE THIRD-PARTY COMPLAINT WAS FILED**

68. After a series of motions, the District Court dismissed with prejudice all the claims in American Summit's Third-Party Complaint. It therefore held that American Summit did not have standing to pursue a claim of illegal issuance of replacement certificates since it was not a shareholder or owner of the disputed stock. American Summit appealed, and Beardmore cross-appealed.

69. On December 10, 2003, the Eighth Circuit issued its opinion, in which it reversed the ruling of the District Court and held that American Summit, and not Beardmore, retained ownership of Stock Certificate 33. It remanded the case back to the District Court for entry of an order vesting ownership of the shares evidenced by Certificate 33 in American Summit, with no deficiency, and for a reconsideration of American Summit's standing to assert its claim regarding the Illegal, Unauthorized and *Ultra Vires* Issuance of Certificates No. 43, 44, 45.

70. From and since April 27, 2001, Haugan and Kell, as directors of Superior, and Kell, as director and president of The Lake Bank, critically mismanaged The Lake Bank, resulting in severe loan losses and a critical depletion of Bank assets raising significant concerns on the part of federal regulators. As a result, regulators issued a directive requiring that the owners of The Lake Bank sell its assets and liabilities to a third party.

71. Only 10 days after the appellate court ruled that American Summit was, in fact, owner of 1,500,000 shares of the stock of Superior, on December 18, 2003, the directors of Superior, including Third-Party Defendant Kell, entered into a Stock Purchase Agreement with a group of six individual investors, pursuant to which Superior agreed to sell all 1,200 shares of stock of The Lake Bank, with a closing to occur no later than February 15, 2004. This date was later amended to March 15, 2004 by agreement of the parties.

72. On April 28, 2004, Defendant Haugan notified the shareholders of Superior that it had sold its interest in The Lake Bank on March 10, 2004. Despite the sale amount of $2,550,000, in fact no cash was paid to Superior because of certain liabilities of the bank that the buyers contracted to assume. A true and correct copy of the Stock Purchase Agreement is attached hereto as Exhibit A.

73. Because the shares of The Lake Bank were the only asset of any value owned by Superior, after the asset sale, the shares of stock of Superior became worthless. American Summit has therefore suffered a complete loss of its investment.

**COUNT I**
**RECOVERY OF ILLEGAL, UNAUTHORIZED AND *ULTRA VIRES* ISSUANCE OF CERTIFICATES NO. 43, 44, AND 45**
**(Against Third-Party Defendants Kell, Haugen and Leftcowitz)**

74. American Summit realleges and incorporates by reference the allegations in numbered paragraphs 1-93 of the Third-Party Complaint as though fully set forth herein.

75. Certificate 42 was surrendered to Superior by Beardmore with the request that Superior issue new certificates (42, 43 and 44) to Kell, Haugen and Leftcowitz.

76. At the time Certificates Nos. 43, 44, and 45 were issued in the aggregate amount of 1,500,000 shares to Kell, Haugen, and Leftcowitz, each of them was aware that one or more of Founders, American Summit or DC claimed an interest in the stock evidenced by Certificate 33, Certificate 42, and Certificates 43, 44 and 45.

77. Each of Kell, Haugen and Leftcowitz were aware at that time that American Summit claimed to be entitled to the stock, subject only to approval by the Federal Reserve Board, pursuant to American Summit's exercise of the Founders Option and the DC Option.

78. Pursuant to Minn. Stat. § 336.8-405(b), Superior is entitled to recover Certificates 43, 44 and 45 because they were issued illegally and because Kell, Haugen and Leftcowitz are not protected purchasers.

79. By this Count I, American Summit seeks an order determining that the issuance of Certificate Nos. 43, 44 and 45 to Haugen, Leftcowitz and Kell was illegal, unauthorized, void and *ultra vires* and directing Haugen, Leftcowitz and Kell to surrender such certificates for cancellation.

**COUNT II**
**CONVERSION**

**(Against Third-Party Defendants Kell, Haugen and Lefcowitz)**

80. American Summit realleges and incorporates by reference the allegations in numbered paragraphs 1 through 79 of the Third-Party Complaint as though fully set forth herein.

81. Kell, Haugen, and Lefcowitz, acted in concert to deprive American Summit of its interests in the 1,500,000 shares of Superior common stock in which American Summit held a security interest and on which it foreclosed, and to acquire such interests for themselves.

82. In so doing, Kell, Haugen, and Lefcowitz knowingly and/or negligently participated in conversion, by interfering with the valid property interest of American Summit in Superior and depriving American Summit of its interest in that property.

83. By this Count I, American Summit seeks judgment against Kell, Haugen, and Lefcowitz for the value of the 1,500,000 shares, in an amount not less than $1.9 million.

**COUNT III**
**BREACH OF COMMON LAW FIDUCIARY DUTY**

**(Against Third-Party Defendants Kell, Haugan and Lefcowitz)**

84. American Summit realleges and incorporates by reference the allegations in numbered paragraphs 1-90 of the Third-Party Complaint as though fully set forth herein.

85. Third-Party Defendants Kell, Haugan, and Lefcowitz, as shareholders of a closely-held corporation, had a fiduciary duty to shareholder American Summit.

86. By preventing American Summit from participating in the operations and governance of Superior, Third-Party Defendants Kell, Haugan, and Lefcowitz failed to deal openly, honestly, and fairly with American Summit, as a shareholder, and such conduct constituted a breach of their fiduciary duty.

87. Third Party Defendants Kell, Haugan and Lefcowitz breached their fiduciary duty to American Summit by failing to properly supervise the affairs of The Lake Bank, and by failing to take necessary actions to ensure that The Lake Bank had appropriate underwriting procedures and followed safe and sound banking practices.

88. As a result of the breaches of fiduciary duty of Kell, Haugen and Lefcowitz, American Summit has been damaged in an amount to be proved at trial.

**COUNT IV**
**OPPRESSION UNDER MINN. STAT. § 302A.751**

**(Against Third-Party Defendants Kell, Haugan, and Lefcowitz)**

89. Paragraphs 1 through 95 of the Third-Party Complaint are hereby incorporated by reference as though fully alleged herein.

90. As of May 4, 2001, the date on which American Summit refused Beardmore's tender of payment on the Note, American Summit, as secured creditor, elected to retain the collateral in full satisfaction of the debt, and became the owner of the shares of Superior stock evidenced by Certificate 33.

91. Subsequent to May 4, 2001, third-party defendants Kell and Haugan, as directors of Superior, acted fraudulently, illegally or in a manner unfairly prejudicial toward American

Summit in its capacity as a shareholder of a closely-held corporation or, alternatively, caused corporate assets of Superior to be misapplied or wasted.

92. On information and belief, third-party defendant Lefcowitz was a person in control of Superior from and after the date of his illegal acquisition of shares of Superior and participated with third-party defendants Kell and Haugan in the wrongful actions described herein.

93. Subsequent to May 4, 2001, by refusing to acknowledge American Summit's status as shareholder, and thereby preventing American Summit from participating in the management of Superior and frustrating the reasonable expectations of American Summit, Third-Party Defendants Kell, Haugan and Lefcowitz acted in a manner unfairly prejudicial toward American Summit, in its capacity as a shareholder, and by their acts have damaged American Summit.

94. As a remedy for the unfairly prejudicial acts of Third-Party Defendants Kell and Haugan, American Summit is entitled to an order requiring Third-Party Defendants to pay for the fair value of its shares in Superior as of the date of purchase on May 4, 2001.

**WHEREFORE**, American Summit prays for judgment as follows:

1. On Count I, for judgment against Kell, Haugan, and Lefcowitz determining that the issuance of Certificate Nos. 43, 44 and 45 to Haugen, Leftcowitz and Kell was illegal, unauthorized, void and *ultra vires* and directing Haugen, Leftcowitz and Kell to surrender such certificates for cancellation.

2. On Count II, for judgment against Kell, Haugen, and Lefcowitz for the damages resulting from their conversion of property rights of American Summit in an amount not less than $1,900,000 based on the value of the 1,500,000 shares;

3. On Count III, for judgment against Kell, Haugan, and Lefcowitz for breach of their fiduciary duty to American Summit as a shareholder in an amount in excess of $50,000.

4. On Count IV, for judgment against Kell, Haugan and Lefcowitz for their oppression of American Summit as a shareholder in an amount in excess of $50,000.

5. For an award of American Summit's costs and attorneys' fees.

6. For such other and further relief as the Court may deem just and equitable.

Dated: April 14, 2005 **MASLON EDELMAN BORMAN & BRAND LLP**

By: s/ J. Alison Morris
Alain M. Baudry (#186685)
J. Alison Morris (#0312150)
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 672-8200
Fax: (612) 672-8397

**ATTORNEYS FOR DEFENDANTS/ THIRD PARTY PLAINTIFFS AMERICAN SUMMIT FINANCIAL HOLDINGS, LLC**

351661v5